UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

DION SHORTT,

                             Plaintiff,

            -v-

THE CITY OF NEW YORK, NYPD Officer AREF
REDA (Shield No. 17664), NYPD Sergeant JOHN DOE 1,
NYPD Officer JOHN DOE 2 through JOHN DOE 4
(the name "John Doe" being fictitious, as the true names
and shield numbers are not presently known), in their
individual capacities,

                             Defendants.

-------------------------------------------------------------------x

**FIRST AMENDED COMPLAINT
AND DEMAND FOR A JURY
TRIAL**

Index No. 14-CV-6145 (NG) (SMG)

       Plaintiff DION SHORTT, through his attorney Robert M. Quackenbush of Rankin &

Taylor, PLLC, as and for his first amended complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, and

   Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

   Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff DION SHORTT's rights were violated when officers of the NEW YORK CITY

   POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis arrested

   him and used unlawful force against him. By reason of defendants' actions, including their

   unreasonable arrest and use of force, Mr. SHORTT was deprived of his constitutional rights.

3. Mr. SHORTT seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

4. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the First,

   Fourth, and Fourteenth Amendments to the Constitution of the United States.

5.  This Court has subject matter jurisdiction over federal claims, such as those at issue in this lawsuit, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

6.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that Mr. SHORTT's claims arose in Brooklyn, New York, within the confines of this judicial district.

7.  An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

8.  Plaintiff DION SHORTT is, and was at all times relevant to this action, a resident of the County of Kings in the State of New York.

9.  Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

10. Defendants NYPD Officer AREF REDA (Shield No. 17664), NYPD Sergeant JOHN DOE 1, and NYPD Officers JOHN DOE 2 through JOHN DOE 4 (the name "John Doe" being fictitious, as the true name and shield number are not presently known) (referred to collectively as the "officer-defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

11. The true names and shield numbers of defendants Sgt. DOE 1 and Officers DOE 2 through DOE 4 are not currently known to Mr. SHORTT. However, upon information and belief, they were employees or agents of the NYPD on November 8, 2012, the date of the incident described herein. Accordingly, Sgt. DOE 1 and Officers DOE 2 through DOE 4  may be

entitled to representation in this action by the New York City Law Department ("Law Department") upon their respective requests, pursuant to General Municipal Law § 50-k. The Law Department, then, is hereby put on notice (a) that Mr. SHORTT intends to name Sgt. DOE 1 and Officers DOE 2 through DOE 4 as defendants in an amended pleading once their true names and shield numbers become known to Mr. SHORTT and (b) that the Law Department should immediately begin preparing their defenses in this action.

12. The officer-defendants are being sued in their individual capacities.

13. At all times relevant herein, the officer-defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

14. The officer-defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of Mr. SHORTT's rights.

15. At all relevant times, the officer-defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

16. The events described herein occurred primarily on November 8, 2012 at approximately 8:45p.m. near the corner of East 34th Street and Church Avenue in Brooklyn, New York.

17. At approximately the time and date above, Mr. SHORTT was lawfully driving his vehicle on Church Avenue when the officer-defendants pulled him over.

18. Two of the officer-defendants approached the vehicle from behind – one on the passenger side and one on the driver-side.

19. The officer-defendants requested that Mr. SHORTT produce his license and registration, and Mr. SHORTT did so without hesitation.

20. Sgt. DOE 1 then approached the vehicle and ordered Mr. SHORTT and his acquaintance to get out of the vehicle.

21. Mr. SHORTT reasonably feared that the officer-defendants might mistake him as reaching for a weapon if he removed his left hand from the steering wheel and reached down towards the door lock.

22. Afraid of making any sudden movements, and with his hands remaining on the steering wheel, Mr. SHORTT asked the officer through the open window to reach into the car and unlock it so that Mr. SHORTT could get out safely.

23. In response, one of the officers reached into the car and unlocked it.

24. Before Mr. SHORTT had the opportunity to get out of the car by himself, one of the officer-defendants grabbed Mr. SHORTT by the throat, choked him, and pulled him out of the vehicle. The officer-defendants put Mr. SHORTT chest-first against the car and at least one of the officer-defendants, upon information and belief Sgt. DOE 1, punched Mr. SHORTT in the torso while other officer-defendants looked on but did nothing to prevent the unnecessary use of force.

25. The officer-defendants then tightly rear-cuffed Mr. SHORTT, causing pain, injuries and skin discoloration which persists to the present.

26. The officer-defendants threw Mr. SHORTT to the ground and picked him up and slammed him into the pavement, eventually picking him up again and throwing him forcefully into his car, causing injury to himself and damage to the car.

27. The officer-defendants brought Mr. SHORTT to a nearby precinct stationhouse and then to Brooklyn Central Booking.

28. Based entirely on Officer REDA's sworn fabrications, Mr. SHORTT was charged with several violations of the law.

29. Mr. SHORTT was offered, and he accepted, an adjournment in contemplation of dismissal which resulted in the dismissal of the charges against him. He was thereafter released from custody.

30. Mr. SHORTT spent slightly less than 24 hours in police custody.

31. After he was released from custody, Mr. SHORTT went straight to a hospital to treat the injuries to his wrists, back and chest.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**
(*Against the Officer-Defendants*)

32. Mr. SHORTT incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

33. The officer-defendants, under color of state law, subjected Mr. SHORTT to the foregoing acts and omissions, thereby depriving him of his rights, privileges and immunities secured by the First, Fourth and Fourteenth Amendments to the United States Constitution, including but not limited to deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of his person and property, including false arrest, false imprisonment and excessive force, and the failure to intervene to prevent same, against all officer-

defendants; (b) freedom from the lodging of false charges against his by a police officer, against Officer REDA; (c) freedom from having a police officer fabricate evidence against him, against Officer REDA; (d) freedom from retaliatory arrest and retaliatory prosecution, against all officer-defendants.

34. The officer-defendants' deprivation of Mr. SHORTT's constitutional rights resulted in the injuries and damages set forth above.

**SECOND CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**
(*Against THE CITY OF NEW YORK*)

35. Mr. SHORTT incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

36. All of the acts and omissions by the officer-defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence on November 8, 2012 and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

37. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

38. The acts complained of were carried out by the aforementioned officer-defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

39. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

a. Using excessive force on individuals who are already compliant with police orders and/or already restrained;

b. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony in order to protect other officers;

c. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

d. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

e. Retaliating against officers who report police misconduct; and

f. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

40. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

a. People v. Alicea, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant convicted of 10 felony counts of filing a false document and one misdemeanor count of official misconduct, for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly showed that the two arrestees had no contact; in response to the indictment, Manhattan District Attorney Cy Vance stated "We rightfully trust our police officers to report their activities truthfully. Those who do not erode the public's trust in law enforcement… To falsely accuse anyone of a drug sale is not only unacceptable, it is a crime.");

b. People v. Arbeedy, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but

7

even more distressingly by the seeming casualness by which such conduct is employed");

c.  <u>Thompson v. City of New York</u>, 10-CV-3603 (ARR) (SMG) (E.D.N.Y.) (while arrestee is handcuffed and compliant, police officers use their Asp, or expandable metal baton, to beat plaintiff and also apply Mace to his face without cause);

d.  <u>Zabala v. City of New York</u>, 3771/2010 (Sup. Ct., Kings Co.) (police officers severely beat and TASER a compliant, prone, bloodied and semi-conscious suspect after he had surrendered);

e.  <u>Ashe v. City of New York</u>, 09-CV-9696 (GBD) (THK) (S.D.N.Y.) (police officers beat and use Mace upon arrestees even though they were both already handcuffed and compliant);

f.  <u>Long v. City of New York</u>, 09-CV-6099 (AKH) (S.D.N.Y.); <u>People v. Pogan</u>, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, <u>to wit</u>, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

g.  <u>Moise v. City of New York</u>, 09-CV-9855 (DC) (JLC) (S.D.N.Y.) (police officers beat and use Mace upon a compliant arrestee while he was already in handcuffs);

h.  <u>Taylor-Mickens v. City of New York</u>, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

i.  <u>Lin v. City of New York</u>, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence);[1]

j.  <u>Colon v. City of New York</u>, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on <u>Iqbal</u>/<u>Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported

---

[1]     For a description of this case and settlement, <i>see</i>, Anahad O'Connor, <i>City Pays $98,000 to Critical Mass Cyclists</i>, N.Y. Times, March 30, 2010, <i>available at</i> http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

k.  <u>Callaghan v. City of New York</u>, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, <u>to wit</u>, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[2]

l.  <u>Dunlop v. City of New York</u>, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

m.  <u>MacNamara v. City of New York</u>, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

n.  <u>McMillan v. City of New York</u>, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

o.  <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

p.  <u>Smith v. City of New York</u>, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

q.  <u>Powers v. City of New York</u>, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

r.  <u>Nonnemann v. City of New York</u>, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

s.  <u>Richardson v. City of New York</u>, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive

---

[2]  For a description of this case and the nearly $1 million settlement, *see*, Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/19critical.html?_r=1.

force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

t.  Barry v. New York City Police Department, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

u.  Taylor v. City of New York, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as Richardson, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

v.  Walton v. Safir, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo); and

w.  White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption").

41. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, inter alia, by the following:

a.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and

lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[3]

b.  Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c.  In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, then-NYPD Commissioner Raymond acknowledged, "When it happens, it's not for personal gain.  It's more for convenience."[4]

d.  Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[5] When it did, however, then-Commissioner KELLY controlled whether the NYPD pursued the matter and he alone had the authority to impose discipline on the subject officer(s). During Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[6] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the

---

[3]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[4]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[5]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).  *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[6]     Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[7]

e. In 2012, out 5,760 complaints taken up by the CCRB, the CCRB substantiated only 967 (about 9%). *See*, CCRB Annual Appendix 2012, *available at* http://www.nyc.gov/html/ccrb/downloads/pdf/ccrb_annual_appendix_2012.pdf. A former employee of the CCRB has reported that there is strong and explicit institutional pressure within the CCRB to keep the number of unsubstantiated cases to a minimum. *See* David Noriega, *The Thin Blue Lie*, New Inquiry, *available at* http://thenewinquiry.com/essays/the-thin-blue-lie/. From 2002 through 2010, in 92 percent of the substantiated cases referred to the NYPD by the CCRB, the NYPD did not follow the CCRB's recommendation that officers with substantiated claims of misconduct be disciplined with the most serious penalty of charges and specifications.[8] In 2012, the NYPD issued only verbal or written "instructions" to the subject officer in 62 percent of the substantiated complaints referred to them by the CCRB, and declined to take any action whatsoever in 21 percent of such cases.[9]

42. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, <u>inter alia</u>, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[10]

---

[7]      Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[8]      "Diminished Accountability: How Discipline for Police Misconduct is Downgraded by the NYPD," Citizens Union of the City of New York, March 2012, available at http://www.citizensunion.org/www/cu/site/hosting/Reports/CUReport_AccountabilityPoliceMisconduct.pdf.

[9]      CCRB Annual Report 2012, *available at*  http://www.nyc.gov/html/ccrb/downloads/pdf/ccrb_annual_2012.pdf.

[10]      Mollen Commission Report, p. 36.

[…]

> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[11]

b.  In June of 2011, in the case in New York County Supreme Court entitled People v. William Eiseman (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[12]

c.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[13] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

---

[11]     Mollen Commission Report, pp. 40-41.

[12]     Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[13]     Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.
>
> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.
>
> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[14]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[15]

e.  In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.

---

[14]  *Id.*

[15]  John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[16]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[17]

f.   In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[18] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[19]

g.   Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations

---

[16]   Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[17]   John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[18]   In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_out_35g_to_granny_busted_as_hooker.html.

[19]   *Id.*

reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[20]

43. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, <u>inter alia</u>, by the following:

    a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

    b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

    c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

44. The existence of the above-described unlawful <u>de facto</u> policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, then-Commissioner Kelly.

45. The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned <u>de facto</u> policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein

---

[20]     David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

46. All of the foregoing acts by defendants deprived Mr. SHORTT of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraph "33" above.

47. Defendant CITY knew or should have known that the acts alleged herein would deprive Mr. SHORTT of his rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

48. Defendant CITY is directly liable and responsible for the acts of the officer-defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

49. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including then-Commissioner Kelly, did not take steps to terminate these policies, practices and/or customs, did not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory

limits on the exercise of their authority, and instead sanctioned and ratified these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

50. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the officer-defendants felt empowered to exercise unreasonable and wholly unprovoked force against Mr. SHORTT, arrest Mr. SHORTT without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Mr. SHORTT's constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, the officer-defendants failed to intervene in or report other officer-defendants' violation of Mr. SHORTT's rights or subsequent perjury.

51. Mr. SHORTT's injuries were a direct and proximate result of the CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the CITY and the NYPD to properly supervise, train and discipline their police officers.

52. The actions of the officer-defendants resulted from and were taken pursuant to the following de facto policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

53. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the Mr. SHORTT's constitutional rights.

## JURY DEMAND

54. Mr. SHORTT demands a trial by jury in this action on each and every one of his damage claims.

   *WHEREFORE*, Mr. SHORTT demands judgment against the defendants individually and jointly and prays for relief as follows:

a.   That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish and humiliation; and

b.   That he be awarded punitive damages against the officer-defendants; and

c.   That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.   For such other further and different relief as to the Court may seem just and proper.

Dated:      New York, New York
            April 21, 2014

                                 Respectfully submitted,

                                 /s/
                        By:      _____
                                 Robert M. Quackenbush
                                 Rankin & Taylor, PLLC
                                 *Attorneys for the Plaintiff*
                                 11 Park Place, Suite 914
                                 New York, New York 10007
                                 t: 212-226-4507